**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Sep 05 2012, 9:45 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MARK SMALL**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**ALEXANDRA D. A. THOMAS**
DCS, Local Office in Montgomery Co.
Crawfordsville, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION      )
OF THE PARENT-CHILD RELATIONSHIP      )
OF: D.H.; C.H.; & A.H. (Minor Children),   )
                                       )
And                                    )
                                       )
D.M. (Mother),                         )
                                       )
    Appellant-Respondent,              )
                                       )
       vs.                          )      No. 54A05-1202-JT-56
                                       )
THE INDIANA DEPARTMENT OF              )
CHILD SERVICES,                        )
                                       )
    Appellee-Petitioner.               )
                                       )

APPEAL FROM THE MONTGOMERY SUPERIOR COURT
The Honorable Peggy Q. Lohorn, Judge
Cause Nos. 54D02-1103-JT-54, 54D02-1103-JT-55 & 54D02-1103-JT-56

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**VAIDIK, Judge**

**Case Summary**

D.M. ("Mother") appeals the involuntary termination of her parental rights to her children. Concluding that the Indiana Department of Child Services ("DCS"), local office in Montgomery County ("MCDCS"), presented clear and convincing evidence to support the trial court's judgment, we affirm.

**Facts and Procedural History**

Mother is the biological mother of D.H., born in June 1996, A.H., born in March 2000, and C.H., born in July 2004.[1] The facts most favorable to the trial court's judgment reveal that in September 2009, MCDCS filed a petition alleging D.H. was a child in need of services ("CHINS") after substantiating a report of inappropriate sexual conduct between D.H. and A.H. when the children were left home alone and unsupervised. During the incident, D.H. engaged in inappropriate sexual conduct with A.H. and left a hickey on his younger sibling's neck. A.H. also reported that he was afraid of D.H., and D.H. agreed that it would be unsafe for his younger siblings if he were to remain in the family home.

Unfortunately, this was not DCS's first encounter with Mother and the children, as the family had a substantial history of involvement with at least two county DCS offices

---

[1] The biological father of D.H. and A.H. is J.H. The biological father of C.H. is E.B. The parental rights of both biological fathers were also terminated by the trial court. Neither biological father participates in this appeal. Consequently, we limit our recitation of the facts solely to those facts pertinent to Mother's appeal.

dating back to 2000 and consisting of numerous substantiated reports of environmental health endangerment, neglect, lack of supervision, and domestic violence. Additionally, D.H. had been removed from the family home and placed in residential care at ResCare Residential Center in 2007 after MCDCS substantiated a report that he had shoved a garden hose in A.H.'s rectum.

As a result of this most recent substantiated report of sexual misconduct, D.H. was adjudicated a CHINS, removed from the family home, and returned to ResCare for treatment. The trial court entered a dispositional order as to D.H. in early December 2009. The dispositional order formally removed D.H. from his Mother's care and adjudicated the child a ward of MCDCS. The dispositional order also directed Mother to participate in several services designed to help improve her parenting skills and facilitate reunification with D.H. Among other things, Mother was ordered to: (1) participate in home visits with D.H. while abiding by a safety plan; (2) engage in family therapy; and (3) take part in family preservation services upon D.H.'s release from ResCare. D.H. was allowed to return to the family home as an in-home CHINS in December 2009.

In January 2010, MCDCS received a report that a serious domestic dispute had occurred in the family home between Mother and her husband, G.M. During its assessment of the matter, MCDCS learned that G.M., who is an alcoholic, was in a drunken state and broke a television set with a hammer during the altercation with Mother. Mother was injured during the incident and was bleeding. G.M. also threatened to kill Mother and all three children while the children were present.

As a result of its investigation, MCDCS and Mother agreed that it was not in the children's best interests for her to remain in a relationship with G.M. Mother also signed a safety plan stating she would not allow the children to be present whenever G.M. was drinking alcohol or if she and G.M. were having any sort of domestic dispute. In addition, Mother was also offered, and appeared to accept, several home-based services. G.M. agreed to begin substance-abuse treatment.

Sometime during the next several months, Mother reconciled with G.M. and another episode of domestic violence erupted in the presence of the children. During this incident, which occurred in early April 2010, G.M., who had been drinking alcohol since the day before, was intoxicated and threw a grill and cell phone. Mother was struck by an object and left the home for a period of time. G.M. then threatened to strike D.H. on the head with a monkey wrench when the child acted to protect his younger siblings.

When MCDCS caseworkers investigated the matter, they again admonished Mother to have no further contact with G.M. Mother agreed that she would not be returning to G.M.'s home and that she was "absolutely done" with G.M. Tr. p. 129. Later the same month, however, MCDCS received yet another report of a domestic violence incident involving Mother and G.M. During MCDCS's assessment, Mother was discovered at G.M.'s house and thereafter admitted that she and the children were living in the house next door to G.M. The children confirmed that there had been another argument the evening before between Mother and G.M., and the caseworker observed that D.H.'s mental health had deteriorated. Mother also blamed D.H. for all the troubles in the home and requested that the child be removed.

4

As a result of its assessment, all three children were taken into emergency protective custody. D.H. was placed at Valley Vista Hospital for acute care, and the younger two children were placed in foster care. CHINS petitions as to D.H.'s two younger siblings were filed several days later and granted in June 2010. Following a dispositional hearing in July 2010, A.H. and C.H. were formally removed from Mother's care and made wards of MCDCS. As with D.H.'s CHINS case, Mother was again ordered by the trial court to complete various services designed to enhance her parenting deficiencies and to facilitate reunification of the family, including domestic-violence classes.

Although verbally agreeable, Mother's participation in court-ordered reunifications services was sporadic and ultimately unsuccessful. Throughout the underlying CHINS and termination proceedings, Mother continued to engage in a relationship with G.M., had several residences, lived with various friends, and failed to maintain consistent contact with MCDCS. She attended only one of the court-ordered domestic-violence classes, and her attendance for home-based counseling services was inconsistent and continued to decrease. Although Mother made some progress cognitively in gaining insight during individual therapy sessions, her therapist reported that Mother remained unable and/or unwilling to make the necessary changes in her behavior to safely parent the children.

As for visitation with the children, Mother attended four of a possible thirty-six supervised visits with A.H. and C.H. between January and March 2010. Although Mother experienced a brief period of improvement with visits during which she was

5

allowed to have semi-supervised visits with A.H. and C.H. from May through August 2010, her success was short lived. Mother soon began to shorten her visits with the children, and she allowed an unauthorized person to be present on at least one occasion. Mother also began to miss visits altogether, blaming these absences on her new job and lack of adequate transportation despite MCDCS's offers of assistance in these areas. In March 2011, Mother became angry at her therapist and left her irate, obscene phone messages. Because the therapist felt threatened, she was advised by MCDCS to discontinue all home-based services.

MCDCS eventually filed petitions under separate cause numbers seeking the involuntary termination of Mother's parental rights to all three children in March 2011. A consolidated evidentiary hearing pertaining to all three children was held in November 2011. During the termination hearing, MCDCS presented evidence establishing that Mother remained incapable of providing the children with a safe and stable home environment. Moreover, MCDCS established that Mother never achieved stable housing and employment, failed to successfully complete parenting classes and/or a domestic-violence program, and never progressed past semi-supervised visits with the children.

As for the children, MCDCS established that D.H. was diagnosed with ADHD, mood disorder, and bi-polar disorder. C.H. was likewise diagnosed with ADHD, and A.H. is partially deaf. All three children were participating in therapy. Although the children's behavioral issues were improving, service providers testified that all three children needed a safe and permanent home environment, free from domestic abuse. Additionally, by the time of the termination hearing, C.H. and A.H. were living together

6

and thriving in the home of their maternal grandparents. D.H. was participating in ResCare's community-based Integrated Services Program, which allowed him to live with the maternal grandparents while receiving treatment, but also provided an option for D.H. to return for residential care if behavioral issues arose.

At the conclusion of the termination hearing, the trial court took the matter under advisement. In January 2011, the trial court entered its judgment terminating Mother's parental rights to all three children. Mother now appeals.

## Discussion and Decision

When reviewing termination of parental rights cases, we will neither reweigh the evidence nor judge witness credibility. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

Here, in terminating Mother's parental rights, the trial court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671

7

N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *L.S.*, 717 N.E.2d at 208.

The "traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001).

Before an involuntary termination of parental rights may occur in Indiana, the State is required to allege and prove, among other things:

> (B)   that one (1) of the following is true:
>
>> (i)   There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii)   There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii)   The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C)   that termination is in the best interests of the child; and

8

>    (D)    that there is a satisfactory plan for the care and treatment of the
>           child.

Ind. Code § 31-35-2-4(b)(2).[2]  "The State's burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'"  *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2).  If the trial court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship.  Ind. Code § 31-35-2-8(a).  Mother does not challenge any of the trial court's specific findings pertaining to the above-cited elements as unsupported by the evidence.  Rather, she simply asserts that the evidence is insufficient to support the trial court's conclusions as to subsections (b)(2)(B) and (C) of the termination statute cited above.  *See* I.C. § 31-35-2-4(b)(2).

## I. Conditions Remedied/Threat

We begin our review by observing that Indiana Code section 31-35-2-4(b)(2)(B) requires a trial court to find that only one of the three elements of subsection (b)(2)(B) has been established by clear and convincing evidence before properly terminating parental rights.  *See L.S.*, 717 N.E.2d at 209.  Here, the trial court determined that subsections (b)(2)(B)(i) and (ii) were established by the evidence. Mother does not challenge the trial court's latter determination.  In failing to do so, Mother has waived review of this entire issue.  *See, e.g.*, *Davis v. State*, 835 N.E.2d 1102, 1113 (Ind. Ct. App. 2005) (concluding that failure to present a cogent argument or citation to authority constitutes waiver of issue for appellate review), *trans. denied*.  Nevertheless, given our

---

[2] We observe that Indiana Code section 31-35-2-4 was amended by Pub. L. No. 48-2012 (eff. July 1, 2012).  The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

preference for resolving a case on its merits, we will review the sufficiency of the evidence supporting the trial court's judgment with regard to subsection (B)(i) of the termination statute, namely, whether MCDCS established by clear and convincing evidence that there is a reasonable probability the conditions resulting in the children's removal and/or continued placement outside her care will not be remedied. *See* I.C. § 31-35-2-4(b)(2)(B)(i).

A trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The trial court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.* Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. Moreover, a county department of child services is not required to provide evidence ruling out all possibilities of change; rather, it need only establish that there is a reasonable probability the parent's behavior will not change. *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). Finally, we have previously explained that Indiana's termination statute makes clear that "it is not just the basis for the initial removal of the child that may be considered for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued

placement outside of the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*.

Here, in determining that there is a reasonable probability the conditions leading to the children's removal and/or continued placement outside Mother's care will not be remedied, the trial court made several pertinent findings regarding Mother's past and present inability to provide the children with a safe and stable home environment. Specifically, the trial court found Mother had "moved to various residences" throughout the underlying proceedings, "attended only one domestic violence treatment session," "had problems with her investment in therapy," and failed to "meet any of the treatment goals" pertaining to her parenting skills, depression, stress, and communication skills. Appellant's App. p. 5. The court further found that Mother's participation in therapy "waned in late 2010 and her behavior to accomplish the goals of fully committing to her children and attending court[-]ordered programs was not exhibited." *Id.* The court also noted that Mother had not visited or contacted the children since April 2011.

Based on these and other findings, the trial court concluded that there was a reasonable probability the conditions resulting in the children's removal would not be remedied. In so doing, the trial court stated:

> Although [M]other has agreed to engage in services such as domestic violence counseling, she fails to follow through. She has consistently placed her children in dangerous situations involving domestic violence and alcohol abuse. Mother has not followed through with meetings with [MCDCS] and has failed to engage in supervised visits on a regular basis with her children. She has failed to follow the safety plan and has engaged in threatening behavior with a [MCDCS] treatment provider, and blames D.H. for the family's problems.

11

*Id.* at 8. A thorough review of the record reveals that these findings and conclusions are supported by abundant evidence.

Testimony from MCDCS case managers, service providers, and the court-appointed special advocate ("CASA") makes clear that, at the time of the termination hearing, Mother's circumstances and ability to care for the children remained largely unchanged. Since the time of the children's removal, Mother had failed to participate in and/or successfully complete a majority of the court-ordered services, including domestic violence classes and individual therapy. Home based counselor Jennifer Green confirmed during the termination hearing that Mother's "investment" in therapy "waned as services continued" and that her last therapeutic encounter with Mother was in March 2011. Tr. p. 151. Green further testified that by the time of their last meeting, Mother had "made progress as far as her insight into her goals, as far as making some connections between her past and patterns in relationships," but that "despite that progress [Mother] made, cognitively, her behavioral changes were not there" with regard to "having a stable home," "fully committing to the visits, fully committing to focusing on her children, fully committing to, um, attending the classes that the judge specifically asked her to attend, all those things." *Id.* at 151-52.

MCDCS case manager Clay Adams likewise confirmed that despite Mother's (1) acknowledgement that G.M. was an alcoholic, (2) repeated assurances that she "didn't believe it was the best thing for her or her children to be around [G.M.]," and (3) statement to Adams that she was "absolutely . . . done" with him, Mother failed to sever her personal relationship with G.M. *Id.* at 126, 129. Additionally, Family Preservation

12

Advocate Annette Mosbaugh described Mother's parenting style as "harsh" and "rude." *Id.* at 182. Although Mosbaugh reported that Mother had progressed to "semi-supervised" visits in August 2010, these privileges were revoked by the end of the following month because Mother was violating the rules by (1) ending visits early, (2) allowing "unauthorized people" to attend the visits, and (3) not being where she said she would be with the children during visits. *Id.* at 188, 191.

Mosbaugh further confirmed that out of a possible thirty-six visits during the months of January and March 2011, Mother visited the children only four times. Mother's last visit with the children was on March 3, 2011. We have previously stated that the "failure to exercise the right to visit one's children demonstrates a 'lack of commitment to complete the actions necessary to preserve [the] parent-child relationship.'" *Lang v. Stark Cnty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*.

Where a parent's "pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). Based on the foregoing, we conclude that MCDCS presented clear and convincing evidence to support the trial court's findings cited above, including its determination that there is a reasonable probability the conditions resulting in the children's removal and continued placement outside Mother's care will not be remedied. These findings, in turn, support the court's ultimate decision to terminate Mother's parental rights to D.H., A.H., and C.H. Mothers'

13

arguments to the contrary amount to impermissible invitations to reweigh the evidence. *See D.D.*, 804 N.E.2d at 264.

## II. Best Interests

We next consider Mother's assertion that MCDCS failed to prove termination of her parental rights is in the children's best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the Indiana Department of Child Services and look to the totality of the evidence. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the trial court must subordinate the interests of the parent to those of the child. *Id.* A trial court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* at 199. Moreover, we have previously held that the recommendations of both the case manager and child advocate to terminate parental rights, coupled with evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *In re M.M.*, 733 N.E.2d 6, 13 (Ind. Ct. App. 2000).

In addition to the specific findings previously cited, the trial court made several additional pertinent findings in determining that termination of Mother's parental rights is in the children's best interests. Specifically, the court found that all three children had been "out of the home" since April 2010 and that Mother had not had any contact with them since April 2011. Appellant's App. p. 6. The court further noted the children had been placed in relative pre-adoptive foster care with their maternal grandparents, D.H.

14

was involved in an ISP, and the grandparents, too, were "engaged in family therapy through the Hamilton Center." *Id.* at 7. Additionally, the court found that D.H.'s "mental health and relationships with siblings" were improving, that the maternal grandparents had lived in a "stable home" in the "same location" for the past fourteen years, and that the maternal grandmother had "protected the children when they were still in [M]other's care by contacting law enforcement when [M]other placed them in dangerous, unsafe situations." *Id.*

Based on these and other findings, the trial court concluded that termination was in the children's best interests, stating:

> These children need a stable and safe home that is free of domestic violence and alcohol abuse. They need consistent parenting and continued treatment by mental health providers. The children need to feel permanency in their lives. Their best interests cannot be served in [M]other's home. Constant moves, domestic violence, abusive relationships, threats to the children, blaming the children for problems, and lack of supervision have been pervasive themes in [M]other's home . . . . Mother's . . . habitual patterns of conduct lead to the conclusion that there is a strong probability of future neglect, abuse[,] or deprivation to these children.

*Id.* at 8-9. These findings and conclusions, too, are supported by the evidence.

During the termination hearing, case workers and service providers testified regarding the children's emotional needs and acting-out behaviors. Michael McKamey, Director of Social Services at ResCare testified that it was "very important" for D.H. to remain in the care of his maternal grandparents and to continue to work through his emotional and behavioral issues in the ISP Program. Tr. p. 96. McKamey further confirmed that D.H. recognizes that his maternal grandparents have made it possible for the children to remain living together, that D.H. "sees that as a major accomplishment,"

15

and that McKamey also believes that maintaining the relationship between all three siblings is "very important." *Id.* at 97.

MCDCS case manager Amy Springmeyer and CASA Jack Gelzleichter also recommended termination of Mother's parental rights as in the children's best interests. Springmeyer confirmed there was a "long history of domestic violence" in Mother's home. *Id.* at 333. Springmeyer further testified that the children were doing well in their current pre-adoptive placement with the maternal grandparents and that remaining in the grandparents' care would "offer the most stability for the children." *Id.* at 385. Similarly, CASA Gelzleichter confirmed that the children had lived at six residences during the underlying proceedings. Gelzleichter further testified that he believed all three children would be "better off" if Mother's parental rights were terminated and the children were adopted by the grandparents who could provide stability for the children. *Id.* at 393-94.

Based on the totality of the evidence, including Mother's unresolved parenting and domestic-violence issues and current inability to provide the children with a safe and stable home environment, coupled with the testimony from Springmeyer and Gelzleichter recommending termination of Mother's parental rights, we conclude that clear and convincing evidence supports the trial court's determination that termination of Mother's parental rights is in D.H.'s, A.H.'s, and C.H.'s best interests.

As a final note, we observe that Mother devotes a considerable amount of time in her Appellant's Brief to discussing this Court's standard of review in termination of parental rights cases. Although Mother fails to suggest what our new standard of review

should be, she nevertheless insists that, "[g]iven the rights at stake, the standard of review should be greater." Appellant's Br. p. 11. Indiana Code section 31-34-12-2 provides that the *standard of proof* to be employed in termination of parental rights cases is one of clear and convincing evidence. "Clear and convincing evidence as a standard of proof requires the existence of a fact to 'be highly probable.'" *In re D.W.*, 969 N.E.2d 89, 95 (Ind. Ct. App. 2012). We further observe that utilization of this clear and convincing standard of proof comports with the United States Supreme Court's mandate that an intermediate standard of proof be applied when an individual's interests at stake in a particular state proceeding are both "particularly important" and "more substantial than the mere loss of money." *See Santosky v. Kramer*, 455 U.S. 745, 756 (1982).

Regarding our appellate standard of review, the Indiana Supreme Court has repeatedly stated that appellate courts must give "'due regard" to the trial court's unique opportunity to judge the credibility of the witnesses." *See In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010). Consequently, this Court will set aside a trial court's judgment in termination of parental rights cases only if the judgment is *clearly erroneous*, that is, only if the trial court's findings do not support its conclusions, or if the court's conclusions do not support its judgment. *See id.* Construed together, we conclude that the clear and convincing standard of proof employed by trial courts, combined with this Court's clearly erroneous standard of review, serves to satisfy constitutional due-process demands while sufficiently safeguarding parental rights. We therefore decline Mother's invitation to depart from well-established statutory and case law and choose, instead, to follow Supreme Court precedent.

17

### III. Conclusion

A careful review of the record leaves us convinced that clear and convincing evidence supports the trial court's findings and ultimate decision to terminate Mother's parental rights to D.H., A.H., and C.H. This Court will reverse a termination of parental rights "'only upon a showing of 'clear error'– that which leaves us with a definite and firm conviction that a mistake has been made.'" *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here.

Affirmed.

MATHIAS, J., and BARNES, J., concur.