**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

May 22 2014, 10:46 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**PATRICK A. DUFF**
Evansville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**DAVID E. COREY**
**ROBERT J. HINKE**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION )
OF THE PARENT-CHILD RELATIONSHIP OF: )
)
J.S. (Minor Child), )
)
AND )
)
T.S. (Father), )
)
Appellant-Respondent, )
)
vs. )   No. 82A01-1309-JT-405
)
THE INDIANA DEPARTMENT OF )
CHILD SERVICES, )
)
Appellee-Petitioner. )

APPEAL FROM THE VANDERBURGH SUPERIOR COURT
The Honorable Brett J. Niemeier, Judge
The Honorable Renee Allen Ferguson, Magistrate
Cause No. 82D01-1212-JT-121

**May 22, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

STATEMENT OF THE CASE

Appellant-Respondent, T.S. (Father), appeals the trial court's Order terminating his parental rights to his minor child, J.S. (Child).

We affirm.

ISSUES

Father raises two issues on appeal, which we restate as follows:

(1) Whether the trial court erred in denying Father's motion to stay the termination proceedings; and

(2) Whether the Department of Child Services (DCS) presented sufficient evidence to support the termination of Father's parental rights.

FACTS AND PROCEDURAL HISTORY

Father and E.H. (Mother)[1] are the biological parents of the Child, who was born on January 14, 2003. Father has eight additional children, and Mother has two others.[2] Father has never had custody of the Child and has never complied with his obligation to

---

[1] Mother voluntarily terminated her parental rights to the Child on December 18, 2012 and is not a party to this appeal. We will include facts pertaining to Mother as appropriate.

[2] We will also include facts about the Child's half-siblings where relevant, but this appeal solely concerns the Child.

pay $160 per month in child support. Father does not have custody of any of his nine children, and although he has only five child support orders, his arrears exceed $150,000.

Father has had very little involvement in the Child's life due, in significant part, to his criminal proclivity. Six months prior to the Child's birth, Father pled guilty to a Class D felony charge for dealing in marijuana and received a suspended sentence; as such, Father was on probation when the Child was born. Then, when the Child was four months old, in May of 2003, Father was arrested and charged, again, with a Class D felony for dealing in marijuana. He pled guilty and was incarcerated until August of 2004. When Mother was arrested in May of 2005, Father cared for the Child for two weeks until his own arrest on May 27, 2005. On October 25, 2005, following a jury trial, Father was convicted of dealing in methamphetamine and conspiracy to deal in methamphetamine, both Class A felonies. Two months before the Child's third birthday, Father was sentenced to serve two, concurrent fifty-year terms in the Indiana Department of Correction (DOC). His earliest possible release date is July 4, 2029. Throughout his incarceration, Father has maintained minimal contact with the Child, consisting of sporadic letters and a few phone calls. Father has not seen the Child since May 27, 2005.

At the time the Child was eight years old, he lived with Mother and his two half-siblings in Evansville, Indiana. On October 7, 2011, the Evansville Vanderburgh School Corporation reported to the Vanderburgh County DCS Office that the Child had been absent from school eleven days and had been tardy fourteen times. School officials stated that, on multiple occasions, Mother arrived at the school apparently under the

influence of drugs—she was jittery, had blood shot eyes, and pounded on the windows and doors to summon her children. Because of the chronic tardiness and absenteeism, school officials informed DCS that the Child was failing most of his class subjects and would have to repeat the third grade. DCS also heard concerns that Mother did not have any food in the house. DCS commenced an investigation, but Mother denied the DCS case manager access to her home. When questioned, Mother admitted that she used marijuana but denied that the Child had missed more than two days of school.

Despite DCS's discussion with Mother, between October 10 and October 13, 2011, the Child missed two more days of school and was several hours tardy on another day. With police assistance, DCS returned to Mother's home with a court order for Mother to submit to a urine drug screen. Mother tested positive for methamphetamine, amphetamine, oxycodone, and THC. DCS spoke with the Child, who explained that the truancy issue was the result of Mother frequently oversleeping. On October 13, 2011, DCS removed all three children from Mother's custody. DCS arranged for the Child's half-brother to live with his father in Louisiana, but the Child and his half-sister were placed in foster care.

Following the Child's removal, DCS discovered that Mother's home was a very "miserable" and "chaotic" environment for the Child, who witnessed Mother's drug use, her rape, and her suicide attempts. (Transcript p. 186). The Child required therapy and special education for his learning disability, as well as his undiagnosed and untreated emotional and behavioral issues. The Child, who did not know his ABCs, had low self-

4

esteem and struggled to control his anger. He was frequently disciplined for his outbursts at school, which included "threats toward teachers, students and burning down [the] building, name calling, cursing, refusing to do class work, disrupting other students and threatening to harm himself." (DCS Exh. 2).

On October 18, 2011, DCS filed a petition alleging the Child to be a Child in Need of Services (CHINS). DCS served Father with notice and a summons on November 18, 2011, which apprised him of the CHINS petition and directed him to appear for an initial hearing. On December 1, 2011, the trial court advised Father, who appeared at the hearing by telephone, of his rights, and Father elected to proceed without the assistance of counsel. Father also informed the court that he wished to participate via telephone in all future hearings. The trial court instructed Father to take advantage of any parenting programs available in the DOC.

On January 6, 2012, the trial court held a fact-finding hearing. Father was aware of the hearing but did not appear. On February 21, 2012, the trial court adjudicated the Child to be a CHINS. Initially, DCS established a permanency plan of reunification with Mother but, due to Father's lengthy sentence, did not consider his reunification with the Child as a viable option. At a dispositional hearing on March 13, 2012, the trial court ordered Mother to participate in DCS-designated services and granted her supervised visitation with the Child.

On March 22, 2012, the trial court conducted a CHINS dispositional hearing for Father. During the hearing, DCS explained to Father that the Child was in foster care and

that it was considering the Child's maternal third cousin, L.R. (Cousin), as a possible relative placement. Father indicated his approval of the placement and offered the names of his parents, as well as his sister—*i.e.*, the Child's paternal aunt (Aunt), as alternative placement options. Following the hearing, the trial court issued an order instructing Father to notify DCS upon his release from incarceration and to inform DCS of any other relatives to consider for the Child's placement. The trial court also reiterated that Father should enroll in any services offered by the DOC which might assist him in his ability to adequately care for the Child upon release.

DCS attempted to place the Child with Father's parents but dismissed this option due to a failed background check. Upon Mother's request, Cousin had contacted DCS to have the Child placed in her home. Following background checks, a home inspection, and Cousin's completion of a foster parenting class, DCS filed a motion on June 7, 2012 to modify the Child's placement from foster care to relative care. The trial court granted the motion, and the Child was placed with Cousin the next day. The Child, whose half-sister was also placed with Cousin, has remained in Cousin's care ever since. Cousin is pursuing adoption of the Child and his half-sister.

Mother never made any effort to comply with her DCS case plan, and she eventually relocated to Carmi, Illinois. She frequently cancelled her visits, which had a detrimental effect on the Child's emotional well-being and contributed to his volatile behavior. On September 25, 2012, pursuant to the recommendation of the Child's therapist, DCS terminated Mother's visitation. On the other hand, Father, over the course

6

of eight years in the DOC, completed several parenting classes, attended substance abuse meetings, enrolled in welding and carpentry programs, and participated in community service activities.

On December 12, 2012, DCS filed a petition to terminate the parental rights of both Mother and Father. On December 18, 2012, the trial court approved DCS's request to modify the Child's permanency plan from reunification to adoption. Father was served with notice, and on January 3, 2013, the trial court advised Father of the termination petition and appointed counsel to represent him. On February 19, 2013, Father filed a request with the trial court for the Child to be placed with Aunt.

On May 29 and June 5, 2013, the trial court conducted a hearing on Father's request to modify the Child's placement. At the close of the evidence, the trial court proceeded directly to the termination hearing. Prior to the introduction of any evidence, however, Father filed a motion to stay the termination proceedings. In his motion, Father explained that a hearing was scheduled for June 19, 2013 in his post-conviction relief (PCR) case, during which he expected the court to decide whether the remainder of his sentence could be served on probation. Father also alleged that procedural deficiencies in the CHINS proceedings had violated his due process rights. In denying Father's motion to stay, the trial court found that the outcome of the PCR case was too speculative to outweigh the Child's need for permanency. The trial court also noted that any "perceived slights [of Father's] constitutional rights not being observed" in the CHINS case had no bearing on the statutory criteria for terminating his parental rights. (Tr. p. 131).

7

At the conclusion of the termination hearing, the trial court took both the placement and termination issues under advisement. On June 11, 2013, the trial court denied Father's request to place the Child with Aunt. On August 20, 2013, the trial court issued its Order terminating Father's parental rights. On September 3, 2013, Father, acting *pro se*, filed a motion to reconsider, which the trial court denied the following day.

Father now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

I. *Stay of Termination Proceedings*

Father claims that the trial court abused its discretion by denying his motion to stay the termination proceedings. Because Father and DCS both treat Father's motion to stay the termination proceedings as a request to continue the hearing, we will do the same. Trial courts are vested with the sound discretion to decide whether to grant or deny a motion for a continuance. *F.M. v. N.B.*, 979 N.E.2d 1036, 1039 (Ind. Ct. App. 2012). Accordingly, we review the trial court's ruling under an abuse of discretion standard. *Id.* It is an abuse of discretion if the trial court "reaches a conclusion which is clearly against the logic and effect of the facts or the reasonable and probable deductions which may be drawn therefrom." *Id.* We will find the trial court has abused its discretion in denying a motion to continue where "the moving party has shown good cause for granting the motion." *Rowlett v. Vanderburgh Cnty. Office of Family & Children*, 841 N.E.2d 615, 619 (Ind. Ct. App. 2006), *trans. denied*. However, there is no

abuse of discretion where "the moving party has not demonstrated that he or she was prejudiced by the denial." *Id.*

Father contends that, by virtue of his PCR petition, he will be released "very shortly" from incarceration and will be capable of raising the Child himself. (Appellant's Br. p. 13). Furthermore, by leaving the Child in Cousin's care pending the outcome of his PCR case, Father avers that a continuation would not prejudice the Child's need for permanency. We disagree and conclude that Father has not shown good cause for granting the motion.

Father argues that his case is analogous to *Rowlett v. Vanderburgh County Office of Family & Children*, 841 N.E.2d at 615. In *Rowlett*, an incarcerated father, who was set to be released from prison just six weeks after the scheduled hearing on the termination of his parental rights, filed for a continuance. *Id.* at 618-19. Our court concluded that the trial court abused its discretion in denying the father's request to continue the hearing because he was entitled to "a sufficient period following his release to demonstrate his willingness and ability to assume parental duties." *Id.*

We acknowledge that there are some factual similarities between *Rowlett* and the instant case, including that Father has not had an opportunity to participate in DCS services; that Father has completed several parenting classes and other beneficial programs while in the DOC; and that the Child is currently placed with the individual who plans to adopt him. Nevertheless, we find that *Rowlett* and the case at hand are clearly distinct. In *Rowlett*, the father's explicit release date was a mere six weeks away;

9

here, nothing in the record supports Father's contention that he will be released from prison sooner than his earliest possible release date in 2029. In fact, the only evidence regarding the status of Father's PCR case indicates that a pre-trial conference was scheduled for June 19, 2013.

It is well-established that parents should be provided the opportunity to establish their parental fitness, but children "cannot wait indefinitely for their parents to work toward preservation or reunification." *In re E.M.*, 4 N.E.3d 636, __ (Ind. 2014). If, under *Rowlett*, the trial court was obligated to suspend the termination proceedings until after Father was released and given time to demonstrate his parenting ability, the Child would be nearly thirty years old. Thus, unlike in *Rowlett*, Father's "ability to establish a stable and appropriate life upon release can[not] be observed and determined within a relatively quick period of time." *In re J.M.*, 908 N.E.2d 191, 196 (Ind. 2009).

Regardless of our finding no good cause for continuing the hearing, we would nevertheless conclude that the trial court did not abuse its discretion in denying Father's motion for a continuance because Father has failed to demonstrate any prejudice. Notwithstanding that the fact of Father's present incarceration establishes that his release was not imminent at the time of the termination hearing, the trial court did not issue its Order terminating Father's rights until August 20, 2013—two months *after* Father's

ostensible release date. Therefore, we find it was well within the discretion of the trial court to decline to further delay the Child's attainment of permanency.[3]

## II. *Termination of Parental Rights*

Father claims that the trial court erred in terminating his parental rights to his Child. The parent-child relationship is valued in our society, and the Fourteenth Amendment to the United States Constitution protects a parent's traditional right to establish a home and raise children. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1230 (Ind. 2013). Thus, courts endeavor to preserve the "fundamental liberty interest[]" of parents to direct the upbringing of their children. *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). However, parental rights are not absolute and must be subordinated to a child's interest in "establishing secure, stable, long-term, continuous relationships." *Id.* Accordingly, when "parents are unable or unwilling to meet their responsibilities by failing to provide for the child's immediate and long-term needs[,]" terminating the parental rights is an appropriate remedy. *Id.* While an extreme measure, termination of parental rights is a device that is intended to protect a child, not punish the parent. *In re Involuntary Termination of Parental Rights of S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004).

---

[3] Father also alleged in his motion to stay that he had been deprived of due process rights during the CHINS proceedings. On appeal, Father claims that he has been "at a disadvantage . . . from the onset of the . . . CHINS case" and that "obstacles . . . prevent[ed] him from being present at the [termination] hearing." (Appellant's Br. pp. 10, 13). Because Father only makes cursory comments without presenting a cogent argument, we agree with DCS that the due process issue is waived. *See Tillotson v. Clay Cnty. Dep't of Family & Children*, 777 N.E.2d 741, 744-45 & 742 n.1; Ind. Appellate Rule 46(A)(8)(a).

In order to terminate a parent's rights to his child, Indiana law requires, in relevant part, that DCS establish by clear and convincing evidence

> (B) that one (1) of the following is true:
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
> (C) that termination is in the best interests of the child; and
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2)(B)-(D); I.C. § 31-37-14-2. "Clear and convincing evidence need not reveal that 'the continued custody of the parent[] is wholly inadequate for the child's very survival.' Rather, it is sufficient to show by clear and convincing evidence that 'the child's emotional and physical development are threatened' by the respondent parent's custody." *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 148 (Ind. 2005) (citation omitted).

Here, Father contends that DCS failed to prove either a reasonable probability that the conditions necessitating the Child's removal will not be remedied or that the continuation of the parent-child relationship poses a threat to the Child's well-being, as well as that termination is in the best interests of the Child.

A. *Standard of Review*

When reviewing a decision to terminate parental rights, we are mindful of the "great deference" to be accorded to the trial court. *In re E.M.*, 4 N.E.3d at __. Accordingly, we do not reweigh the evidence or assess the credibility of witnesses.

*Bester*, 839 N.E.2d at 147. We consider only the evidence, along with any reasonable inferences drawn therefrom, most favorable to the trial court's judgment. *Id.* Where, as here, the trial court issues specific findings of fact and conclusions of law, we employ a two-tiered standard of review. First, we must ascertain whether the evidence supports the findings; second, we must decide whether the findings support the judgment. *Id.* We will uphold the trial court's judgment unless it is clearly erroneous. *Id.* "A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *Id.* (internal quotation marks omitted).

## B. *Remedy of Conditions Resulting in Child's Removal*

Father first contends that the evidence does not support the trial court's determination that the conditions which resulted in the Child's removal will not be remedied. This two-step inquiry requires, first, identifying the conditions which led to the Child's removal and, second, deciding whether there is a reasonable probability that those conditions will not be remedied. *K.T.K.*, 989 N.E.2d at 1231. In making its determination, the trial court must "judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed circumstances." *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*. The trial court should "evaluate the parent's *habitual patterns of conduct* to determine the probability of future neglect or deprivation of the child." *In re I.A.*, 903 N.E.2d 146, 154 (Ind. Ct. App. 2009). To this end, "evidence of a parent's

13

criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment" may properly be considered. *Id.*

### 1. *Reasons for Removal*

Father first argues that he is not responsible for the conditions that warranted the removal. He points out that the Child was removed "due to his [M]other's repeated drug use and [that] said removal continued because of her inability to stay sober for her [C]hild's sake." (Appellant's Br. p. 9). It is undisputed that Mother failed in her parental obligations. However, in the CHINS petition, DCS also listed Father's incarceration as a basis for taking the Child into its custody, and the trial court likewise noted that Father was incarcerated at the time of the Child's removal. *See In re D.W.*, 969 N.E.2d 89, 94 (Ind. Ct. App. 2012).

Due to his incarceration, Father was unable to protect the Child from being exposed to Mother's drug use and suicide attempts; he was not there to make sure the Child was healthy, well-fed, and regularly attended school; and he was not there when DCS had to place the Child in foster care. Furthermore, the record reveals that Father was aware of Mother's drug use and the conditions in her home before DCS's intervention. Yet, instead of notifying the authorities or seeking to have the Child placed with his family, Father ignored the Child's safety and well-being. Therefore, we find that Father's incarceration was a factor in both the Child's removal and his continued placement outside of the home.

### 2. *Reasonable Probability of Conditions Being Remedied*

14

Father next argues that the trial court's findings are insufficient to establish a reasonable probability that the conditions causing the Child's removal will not be remedied. In reaching its conclusion, the trial court specified that Father "has a pattern of instability, not meeting his parental obligations, and is serving an extended criminal sentence." (Appellant's App. p. 55). Citing Father's criminal history, which includes three felony convictions for drug dealing and a misdemeanor for resisting law enforcement—all of which Father incurred in a three-year span—the trial court noted that Father was incarcerated when the Child was removed from Mother's home and remained so at the time of the termination hearing. In addition, the trial court found that Father "has not had stable housing or employment between his periods of incarceration" and has never provided support for the Child. (Appellant's App. p. 53). Moreover, Father "has never solely parented [the Child]" or "exercise[d] the daily responsibility for [the Child's] care as his father." (Appellant's App. p. 53).

Father, in turn, asserts that he "is repeatedly punished for his prior acts, with little to no consideration for his potential early release." (Appellant's Br. p. 11). Additionally, Father argues that "as soon as [he] was made aware of the ongoing problem at home he took control of the situation as much as he could while incarcerated and enrolled in several programs that require lots of hard work. [He] immediately took measures to make his life and the life of his [C]hild better." (Appellant's Br. p. 10).

We find the trial court's findings to be sufficient to support its conclusion. Our court has previously determined that incarceration throughout a child's life evidences "an

historical inability to provide adequate housing, stability and supervision." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied*. At the time of the termination hearing, Father had been incarcerated for all but thirteen months of the Child's ten-and-a-half-year life. Furthermore, as we have already discussed, we find no evidence that Father will be released from incarceration prior to July 4, 2029. Thus, for the foreseeable future, Father will remain unable to care for the Child, and his imprisonment "alone cannot justify tolling" the Child's need for permanency. *In re E.M.*, 4 N.E.3d at __ (internal quotation marks omitted).

Finally, Father's participation in various DOC programs is certainly commendable, but the trial court clearly found that his efforts do not negate the fact that Father has been unstable and unavailable for his Child. The trial court highlighted the fact that Father "continued to commit serious crimes knowing that his [Child] needed him as a father. It is truly a sad situation." (Appellant's App. p. 55). It is the prerogative of the trial court "to weigh a parent's prior history more heavily than efforts made only shortly before termination[,]" and we decline Father's request to reweigh the evidence. *In re E.M.*, 4 N.E.3d at __. Our court has previously found that "[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." *Castro*, 842 N.E.2d at 374. Here, Father made no effort to establish a relationship with the Child while incarcerated. Father testified that he spoke with the Child on the phone one year before the termination hearing and that he wrote the Child letters on occasion, but the bulk of Father's letters

16

were sent within the four months preceding the termination hearing. Moreover, Father expressed his desire for reunification only after DCS filed the termination petition, even explaining that he only contested the termination because he wanted the Child placed with his family rather than Mother's. Accordingly, we find that clear and convincing evidence supports the trial court's determination of a reasonable probability that the conditions causing the removal will not be remedied.[4]

## C. *Child's Best Interests*

Next, Father contends that the trial court's findings are insufficient to establish that termination of his rights is in the Child's best interests. In determining a child's best interests, the trial court must look beyond the factors identified by DCS and consider the totality of the evidence. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). A "trial court need not wait until a child is irreversibly harmed before terminating the parent-child relationship." *Id.* Our court has previously determined that, in conjunction with evidence that the conditions resulting in removal will not be remedied, the recommendation of the case manager and court-appointed special advocate (CASA) to terminate the parental relationship is sufficient to establish that termination is in the child's best interests. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

---

[4] Because Indiana Code section 31-35-2-4(b)(2)(B) requires proof of only one of the enumerated elements, we need not address Father's argument that DCS failed to prove a reasonable probability that the continuation of the parent-child relationship poses a threat to the Child's well-being.

In the present case, the trial court concluded that termination would be in the Child's best interests because he now lives "in a loving [and] stable pre-adoptive home with his half[-]sister." (Appellant's App. p. 55). Specifically, the trial court found that the Child "needs stability and permanency. His present relative pre-adoptive home with therapy is meeting these needs and will be able to do so in the future. He is bonded to his [Cousin] and half[-]sister." (Appellant's App. p. 54). The trial court also found that because of the "stable, consistent environment provided by the current relative placement with the assistance of a psychiatrist, therapists, school counselors, teachers, mentors, and others," the Child's "behaviors and grades have greatly improved. He attends school regularly, has self-esteem, and is improving in school. He now appears to be a happy increasingly well[-]adjusted child." (Appellant's App. p. 54).

Rather than developing an argument or citing authority, Father declares that there is no "evidence that would indicate that the best interest[s] of [the Child] are served by termination of the parental-child relationship" because, while incarcerated, he took "every opportunity available to him to make himself a better parent, a better citizen in the community, and most importantly a better person for the [Child]." (Appellant's Br. pp. 11-12). We disagree and find that the evidence clearly supports the trial court's decision.

During the termination hearing, the Child's CASA testified that it would be in the Child's best interests if Father's parental rights were terminated. Noting that the Child is bonded to Cousin and that he is happy in her care, the CASA stated that Father has

> not been available in this [C]hild's life at all. Because of his absence the [C]hild has lived in this chaos, seeing these horrible things. He didn't have

18

a role model to show him how things should be. He has very low self-esteem, although we see that changing as he progresses and he makes progress at school. He is proud of things. Sometimes he didn't want to show me his report card. Now he wants to go get the report card and show me what he's got, 'cause he's proud of that. I think the Father has been absent so much that his rights should be terminated.

(Tr. p. 188). The DCS case manager also testified that termination would serve the Child's best interests because the Child has waited a year and a half for stability and consistency, "and it's unknown if Father will get out [of prison]." (Tr. p. 200). The Child's school psychologist and two therapists agreed that the Child needs structure and consistency to cope with his emotional issues. He needs to be with "people that know him and love him and will encourage him[,]" and "the interaction . . . between [Cousin and the Child] is very loving, very playful." (Tr. pp. 178, 181). It is clear from the evidence that Cousin makes the Child's needs a priority: she enrolled him in a new school to accommodate his special education needs; she provides a safe and nurturing environment; she maintains a routine and consistent expectations of the Child's behavior; and she has fostered the Child's relationships with his half-siblings and Father's family. Accordingly, we find that clear and convincing evidence establishes it is in the Child's best interests to terminate Father's parental rights.

## CONCLUSION

Based on the foregoing, we conclude that the trial court neither abused its discretion in denying Father's request to continue the termination proceedings nor clearly erred in terminating Father's parental rights to the Child.

Affirmed.

19

ROBB, J. and BRADFORD, J. concur