# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**M. JOSH PETRUNIW**
Tiede Metz & Downs, P.C.
Wabash, Indiana

ATTORNEYS FOR APPELLEE:

**DAVID E. COREY**
DCS Central Administration

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

FILED

Jun 06 2012, 9:27 am

CLERK
of the supreme court,
court of appeals and
tax court

## IN THE
## COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: | ) ) ) ) | |
| D.W., K.K., Ke.K., & L.W. (Minor Children) | ) ) | |
| And | ) ) | |
| J.K. (Father), | ) ) | |
| Appellant-Respondent, | ) ) | |
| vs. | ) ) | No. 85A05-1109-JT-591 |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner. | ) ) | |

APPEAL FROM THE WABASH CIRCUIT COURT
The Honorable Robert R. McCallen, III, Judge
Cause No. 85C01-1103-JT-1; 85C01-1103-JT-2;
85C01-1103-JT-3 & 85C01-1103-JT-4

**June 6, 2012**

**OPINION – FOR PUBLICATION**

**RILEY, Judge**

STATEMENT OF THE CASE

Appellant-Respondent, J.K. (Father), appeals the trial court's termination of his parental rights to his minor children, D.W., K.K., Ke.K., and L.W.[1]

We affirm.

ISSUE

Father raises one issue on appeal, which we restate as the following: Whether the trial court properly terminated his parental rights to his four children.

FACTS AND PROCEDURAL HISTORY

Father and H.W. (Mother) are the parents of four children, D.W., born June 6, 2004; K.K., born August 29, 2005; Ke.K., born July 17, 2008; and L.W., born May 28, 2010. On August 20, 2009, the Wabash County Department of Child Services (DCS) received a report that Mother had been sleeping in a car with her three eldest children, had been leaving her children with various people to care for them, did not have a home or a job, and had a substance abuse problem. The report also stated that Mother's oldest child, D.W., was of school age and was not enrolled in school. At the time, Father was

---

[1] Although the trial court also terminated Mother's parental rights to the four minor children, she is not a party to this appeal.

2

incarcerated. He had been incarcerated since April 1, 2009, and his earliest possible release date was September 2009.

On August 21, 2009, after investigating the report, DCS filed a petition alleging that the children were children in need of services (CHINS). On October 30, 2009, after the parents admitted to the allegations in the CHINS petition, the trial court found the children to be CHINS and placed them into foster care. Subsequently, on December 4, 2009, the trial court held a dispositional hearing whereby it maintained the children's placement in foster care and ordered the parents to complete services and programs. Specifically, the trial court ordered Father to: (1) participate in a parenting and family functioning assessment and follow all recommendations; (2) submit to random drug and alcohol screens as requested with negative results for all substances; (3) participate in home-based services; and (4) receive individual counseling, among other requirements.

On May 28, 2010, during the course of the CHINS proceedings for the eldest three children, Mother gave birth to L.W. Mother's drug screen at the hospital was positive for opiates, and L.W. exhibited signs of withdrawal. As a result, L.W. was transferred to the Neonatal Intensive Care Unit at Lutheran's Children's Hospital. On June 1, 2010, DCS filed a petition alleging that L.W. was a CHINS and placed him in foster care upon his release from the hospital. On July 22, 2010, the trial court conducted a hearing on the CHINS petition and found L.W. to be a CHINS after Mother and Father admitted to the allegations. In its dispositional order, the trial court ordered Father to participate in

substantially the same services and programs in which it had ordered him to participate with respect to the CHINS proceedings relating to the elder three children.

Upon his release from incarceration, Father began participating in the programs and services as ordered by the trial court. He completed a substance abuse assessment at the Wabash Bowen Center (Bowen Center), a community mental health center. Based on the results of the assessment, Father was recommended to participate in intensive outpatient group sessions twice a week. Father never completed the program because he did not show up for any of the sessions.

Under the terms of the dispositional order, Father was required to submit to random drug screens. To fulfill this requirement, Father was instructed to call DCS daily to find out whether he needed to take a drug screen that day. If so, he was required to timely submit the screen. In the course of two years of CHINS proceedings, Father only complied with calling in, submitting to drug screens, and testing negative for drugs during three months: December 2009, July, 2010, and March 2010. During the remaining months, Father either did not call in or tested positive for drugs, including heroin, marijuana, alcohol, and opiates. At the termination hearing, Father admitted to using illegal drugs sporadically throughout the CHINS proceedings up to the first day of the trial court's hearing to terminate his parental rights. Father also testified that his drug use caused him to be frequently tardy for work, which led to his dismissal and subsequent unemployment. DCS offered Father therapy for substance abuse, but Father did not participate in the offered therapy.

4

During the CHINS proceedings, Allison Esch (Esch), a rehabilitation service provider at the Bowen Center, provided Father with home-based services and supervised visits with the children. Father never completed the home-based services due to missed appointments. According to Esch, Father did not show a lot of motivation to follow through with the discussions in the appointments he did attend or to schedule further appointments. Similarly, Father's attendance for court-ordered counseling at the Bowen Center was sporadic. Sometimes he would "hit four sessions in a row and then there [were] a couple of times where he hit two and then he missed several." (Transcript p. 87).

In addition, there was a period of time where Father "disappeared" and did not have any contact or participation in visitation or any other court-ordered services. In January of 2011, the parents were evicted from their apartment due to their inability to pay the rent. They were required to contact family case manager, Sara Cole (FCM Cole), regarding any updates in their address or contact information, but they did not do so. Instead, FCM Cole did not hear from the parents from January 6, 2011, until the end of March, when she was able to locate them through relatives. During this period, Father did not visit the children or participate in any court-ordered services. When FCM Cole finally talked to Father, he explained that he had felt like the termination had already occurred and that he had been in "a very dark place" during those three months; he had been depressed, living in different places, and using drugs. (Tr. p. 54).

5

On March 21, 2011, DCS filed petitions requesting the termination of the parents' parental rights towards all four minor children. On August 4 and September 13, 2011, the trial court held an evidentiary hearing. On September 13, Father testified that he was sober, although he admitted that he had still been using drugs around August 4—the first day of the hearing. Father also testified that he had separated from Mother, was living with his father, and was unemployed. At the conclusion of the hearing, the trial court terminated Mother and Father's parental rights to the children.

Father now appeals. Additional facts will be provided as necessary.

<u>DISCUSSION AND DECISION</u>

Father argues that the trial court erred in terminating his parental rights because the trial court concluded that the conditions that resulted in the children's removal from his custody would not be remedied. In support of his argument, Father claims that he did not cause the conditions that resulted in the children's removal—the three older children were removed from Mother's custody while Father was incarcerated, and L.W. was removed as a result of Mother's use of narcotics during the pregnancy. Thus, according to Father, he cannot be held responsible for a failure to remedy those conditions.

We recognize that the Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re J.S.O.,* 938 N.E.2d 271, 274 (Ind. Ct. App. 2010). A parent's interest in the care, custody, and control of his or her children is arguably one of the oldest of our fundamental liberty interests. *Id.* However, the trial court must subordinate the interests

6

of the parents to those of the children when evaluating the circumstances surrounding a termination of a parent-child relationship. *In re J.H.,* 911 N.E.2d 69, 73 (Ind. Ct. App. 2009), *trans. denied.* Parental rights may therefore be terminated when the parents are unable or unwilling to meet their parental responsibilities. *Id.*

In reviewing termination proceedings on appeal, this court must not reweigh the evidence nor assess the credibility of the witnesses. *Id.* We consider only the evidence that supports the trial court's decision and the reasonable inferences drawn therefrom. *Id.* Where, as here, the trial court has entered findings of fact and conclusions of law, we apply a two-tiered standard of review. *Id.* First, we determine whether the evidence supports the findings, and second, whether the findings support the conclusions of law. *Id.* In deference to the trial court's position to assess the evidence, we set aside the trial court's findings and judgment terminating the parent-child relationship only if they are clearly erroneous. *Id.*

In order to terminate Father's parental rights, DCS was required to prove by clear and convincing evidence:

> (B) that one of the following [was] true:
> (i) There [was] a reasonable probability that the conditions that resulted in the child[ren]'s removal or the reasons for placement outside the home of the parents [would] not be remedied.
> (ii) There [was] a reasonable probability that the continuation of the parent-child relationship [posed] a threat to the well-being of the child[ren].
> (iii) The child[ren] [had], on two (2) separate occasions, been adjudicated [] in need of services[.]
> (C) that termination [was] in the best interests of the child[ren].

7

Ind. Code § 31-35-2-4(b)(2)(B), -(C). [2] Clear and convincing evidence as a standard of proof requires the existence of a fact to "be highly probable." *Hardy v. Hardy,* 910 N.E.2d 851, 859 (Ind. Ct. App. 2009). It need not reveal that "the continued custody of the parent[] is wholly inadequate for the children's very survival." *Bester,* 839 N.E.2d at 148 (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare,* 592 N.E.2d 1232, 1233 (Ind. 1992)). Rather, it is sufficient to show that the children's emotional and physical development are threatened by the parent's custody. *Id.*

In essence, Father argues that the requirements of I.C. § 31-35-2-4(b)(2)(B)(i) (emphasis added) are disjunctive; a trial court may find that either "[t]here [was] a reasonable probability that the conditions that resulted in the child's removal *or* the reasons for placement outside the home of the parents [would] not be remedied," and a finding of one is independent of a finding of the other. Because the trial court here found that the conditions that resulted in the children's removal would not be remedied but did not find that the reasons for placement outside the home of the parents would not be remedied, Father asserts that the trial court erred in terminating his parental rights because he is not at fault for the children's removal from the home.

First, we note that although it was Mother's actions that caused DCS to file petitions to adjudicate the children as CHINS, DCS also cited Father as a reason for the children's removal. In the CHINS petition regarding the elder three children, DCS listed

---

[2] I.C. § 31-15-2-4 was amended by 2012 Ind. Legis. Serv. P.L. 48-2012 (S.E.A. 286) (WEST), but the amendments are not relevant here and do not apply as the termination of Father's parental rights occurred prior to the amendments.

Father's incarceration in support of a CHINS finding. In the CHINS petition for L.W., DCS noted that Father had tested positive for heroin on May 18, 2010 and May 19, 2010. In both CHINS hearings, Father admitted to the allegations, and his admissions were proper bases for the CHINS adjudications.

However, we do agree with the Father that the trial court did not provide sufficient findings that the cause for the removal of the older three children—Father's incarceration—would not be remedied, as Father was released from incarceration shortly after the start of the CHINS proceedings and has remained free from incarceration since. Accordingly, we will address Father's argument that I.C. § 31-35-2-4(b)(2)(B)(i) can be read in the disjunctive and that the trial court therefore did not conclude that the conditions that led to the children's continued removal from Father's home would not be remedied. Because this is an issue of first impression, we will rely on statutory interpretation of I.C. § 31-35-2-4.

The interpretation of a statute is a question of law reserved for the courts. *In re J.Q.,* 836 N.E.2d 961, 964 (Ind. Ct. App. 2005), *reh'g denied.* If a statute is unambiguous, *i.e.*, susceptible to only one meaning, we must give the statute its clear and plain meaning. *In re S.B.,* 896 N.E.2d 1243, 1247 (Ind. Ct. App. 2008). However, if a statute is susceptible to multiple interpretations, we must try to ascertain the legislature's intent and interpret the statute so as to accomplish that intent. *Stewart v. Randolph Cnty. Office of Family and Children,* 804 N.E.2d 1207, 1211 (Ind. Ct. App. 2004), *trans. denied.* In ascertaining the legislature's intent, we consider the phraseology, nature, and

9

design of the statute, and the consequences that flow from the reasonable alternative interpretations of the statute. *In re K.B.,* 793 N.E.2d 1191, 1197 (Ind. Ct. App. 2003). We presume that our legislature intended the statutory language to be applied in a logical manner consistent with the underlying goals and policy of the statute. *In re S.B.,* 896 N.E.2d at 1247.

> Pursuant to I.C. § 31-35-2-4(b)(2)(B),
>
> DCS was required to prove by clear and convincing evidence:
>
>> (B) that one of the following [was] true:
>>> (i)  There [was] a reasonable probability that the conditions that resulted in the child[ren]'s removal or the reasons for placement outside the home of the parents [would] not be remedied.
>>> (ii)  There [was] a reasonable probability that the continuation of the parent-child relationship [posed] a threat to the well-being of the child[ren].
>>> (iii)  The child[ren] [had], on two (2) separate occasions, been adjudicated [] in need of services[.]

Due to the "or" in § 31-35-2-4(b)(2)(B)(i), Father argues that § 31-35-2-4(b)(2)(B)(i) can be read as two independent statutory elements. In other words, the trial court may find that *either* there was a reasonable probability that the conditions that resulted in the children's removal would not be remedied *or* the reasons for placement outside the home of the parents would not be remedied, and a finding of one will preclude a finding of the other absent an independent trial court conclusion. However, our interpretation of the legislature's intent in drafting § 31-35-2-4(b)(2)(B) is that a finding that one part of subsection (i) has been fulfilled is equivalent to a finding that subsection (i) as a whole has been fulfilled.

10

In support of this interpretation, § 31-35-2-4(b)(2)(B) states that DCS must show that *one* of the following is true: subsection (i), subsection (ii), or subsection (iii). Although subsection (i) has two parts, the legislature does not refer to the two parts individually as being sufficient to fulfill § 31-35-2-4(b)(2)(B). The legislature refers to subsection (i) as a complete entity. If the legislature had intended the contents of subsection (i) to constitute two independent elements, it would have separated § 31-35-2-4(b)(2)(B) into four separate subsections rather than three. Thus, we conclude that a finding as to one part of subsection (i) is a finding as to subsection (i) as a whole.

When we apply this interpretation to the facts of the instant case, we cannot agree with Father's assertion that the trial court found that the conditions for removal would not be remedied but did not find that the conditions resulting in the continued placement outside of the home would not be remedied. Because the trial court's determination that the conditions that led to the children's removal would not be remedied was a conclusion that subsection (i) as a whole had been met, and the trial court did not need to independently state that the conditions that led to the children's continued placement outside of the home would not be remedied. However, we still must address whether the trial court's findings support the conclusion that the conditions that led to the children's continued placement outside of the home would not be remedied.

When determining whether there is a reasonable probability that a parent will not remedy the conditions justifying a child's removal from the home or continued placement outside of the home, the trial court must judge a parent's fitness to care for his or her

11

child at the time of the termination hearing. *Rowlett v. Vanderburgh Cnty. Office of Family and Children,* 841 N.E.2d 615, 621 (Ind. Ct. App. 2006). The trial court must evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *C.T. v. Marion Cnty. Dept. of Child Services,* 896 N.E.2d 571, 578 (Ind. Ct. App. 2008), *trans. denied.* DCS is not required to rule out all possibilities of change; rather, it need only establish "that there is a reasonable probability that the parent's behavior will not change." *Id.* (quoting *In re Kay L.,* 867 N.E.2d 236, 242 (Ind. Ct. App. 2007)).

Here, the trial court found that:

Throughout these proceedings, Mother and Father have had a rocky relationship, however, for the most part, they remained together. They are or at least as of the August 4, 2011, hearing, were living in separate residences on the same street in Wabash. The future of their relationship is uncertain though Father has testified that he does not intend to get back together with Mother. The [c]ourt does not believe they will not get back together.

Both Mother and Father have substance abuse issues. Since the children were removed, each has tested positive, on numerous occasions, for a myriad of different substances including: Heroin, Methamphetamine, Hydrocodone, Methadone, and Marijuana. The record is replete with failed drug tests, missed appointments and failures to follow through with services ordered. Father further admitted to continued use of marijuana after the August 4, 2011, TPR hearing. He reports he is now clean, on his own, but acknowledges his addictions. While he has been repeatedly offered substance abuse services by the DCS, he has not followed through and is not participating in any. His "sobriety" is tenuous at best, particularly without any formal assistance and while he says he is now receptive to such assistance, his history indicates otherwise.

During the course of the CHINS proceedings, monthly progress reports were prepared either by DCS and/or service providers. Those monthly reports documented substantial non-compliance by both parents throughout

12

these proceedings. . . . Father, upon his release from jail, was likewise fairly compliant. Beginning in the latter part of 2010 and the early part of 2011, neither of the parties participated in any services. Father described this period as a dark time in his life. Drug use continued and the parties' instability escalated. Fortunately, during this "dark time" when Mother and Father again resorted to behaviors that led to the removal of their children, the children were safely in foster care.

While Father expresses his desire for one more chance, he has not availed himself of the numerous chances previously offered. Simply stated, his testimony that he now gets it and wants to take advantage of all services is too little too late. Father is not engaged in services, he does not have a home of his own, and he remains unemployed.

Tellingly, at a review hearing for the three (3) oldest children on or about August 15, 2011, neither Mother [n]or Father attended that hearing, though they were provided with notice.

(Appellant's App. pp. 8-9). Father disputes the trial court's finding that he and Mother may get back together, but we conclude that the trial court had sufficient findings to support its conclusion even if we do not consider that finding. Father consistently failed to take advantage of services provided and ordered by the trial court and consistently failed to stay clean of drugs. Although Father testified that he has not used drugs in a month, this sobriety is, as the trial court stated, "tenuous" in light of his history. (Appellant's App. p. 9). Accordingly, we determine that the trial court's findings supported its conclusion that the conditions causing the children's continued removal from Father's home will not be remedied. As Father does not dispute any of the trial court's other conclusions of law, we also find that the trial court did not err in terminating Father's parental rights to his four minor children.

CONCLUSION

13

Based on the foregoing, we conclude that the trial court properly terminated Father's parental rights to his four minor children.

Affirmed.

NAJAM, J. and DARDEN, J. concur