# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

09/12/2017, 10:28 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark F. James
Anderson, Agostino & Keller P.C.
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of A.W.K. (Minor Child) and<br><br>A.P.K. (Father),<br>*Appellant-Respondent,*<br><br>v.<br><br>The Indiana Department of Child Services,<br>*Appellee-Petitioner* | September 12, 2017<br><br>Court of Appeals Case No. 71A05-1703-JT-709<br><br>Appeal from the St. Joseph Probate Court<br><br>The Honorable James N. Fox, Judge<br><br>Trial Court Cause No. 71J01-1506-JT-67 |

**Crone, Judge.**

## Case Summary

[1]  A.P.K. ("Father") appeals the trial court's order involuntarily terminating his parental relationship with his minor child, A.W.K. ("Child"). Finding no error, we affirm.

## Facts and Procedural History

[2]  Child was born to Father and H.D. ("Mother") in August 2006. In its termination order, the trial court found the following relevant facts, which Father does not specifically dispute:[1]

> 3. On December 5, 2012, DCS [Department of Child Services] received a report that Child, who resided with his Father, was living in squalid conditions, and was the victim of verbal abuse by Father. Father and Child resided in the home with paternal grandmother. The home was also populated by many cats. The home was found to have urine and feces on the floor from cats and mice. Trash, debris and clutter was present throughout the home. The ceiling in the kitchen had been ripped out due to leaking water. Child was observed to have what appeared to be ringworm. Child was interviewed at The CASIE Center, a local child advocacy center, and he disclosed Dad had not taken him to the doctor, there was fighting in the home, often yelling and cursing at Child.
>
> 4. Child was detained by DCS on December 5, 2012, and placed in foster care. DCS Filed its Verified Petition Alleging CHINS [child in need of services] was filed on December 6, 2016. At the initial hearing held the same day, Father denied the allegations

---

[1] We use "Child" and "Father" where the order refers to them by name. Because Mother executed a consent to Child's adoption, we focus on the findings relevant to Father.

and was appointed counsel. Child was ordered to remain in foster care. Mother admitted the material allegations.

5. On December 27, 2012, a fact-finding hearing was held. Father entered an admission to an Amended CHINS petition filed the same day. The Court adjudicated Child to be a Child in Need of Services, and ordered him to remain in foster care.

6. A dispositional hearing was held on January 9, 2013. The Court entered a dispositional order, and a Parental Participation Order; Father was ordered to do the following:

> a. Allow announced and unannounced visits by the Family Case Manager ("FCM") and service providers, to ensure the safety of the child.
> b. Ensure the child was not removed from St. Joseph County without consent of the Family Case Manager.
> c. Care for the Child if the child was in his care.
> d. Visit with the child on a regular basis as outlined by DCS.
> e. Keep all appointments with any service provider, or show good cause why the appointment could not be kept.
> f. Complete a psycho-parenting evaluation and follow all recommendations.
> g. Obtain and maintain a legal and regular source of income.
> h. Obtain and maintain adequate housing.
> i. Maintain consistent contact with the Family Case Manager.

7. The Court Ordered that Child remain in foster care, and appointed the Court Appointed Special Advocate ("CASA") program on behalf of the child. The child was also ordered to attend school and continue therapy. The permanency plan was reunification.

….

9. Father visited with the child on a consistent basis, and also completed his psychological evaluation in March of 2013. Eric Fikes, the Family Case Manager, testified that inter alia, additional parenting training was recommended.[2] At the Court's Three month hearing on April 3, 2013, Father was found to be in compliance with services.

10. On July 10, 2013, a six month periodic case review hearing was held and the child was ordered to return to the home of his Father. Father was ordered to work with FCM to develop a routine to maintain a safe and clean home, and keep up with Child's well-child medical care, as well as all other existing orders. The permanency plan of reunification was again approved.

11. FCM Erik Fikes filed his permanency report on November 25, 2013, and recommended that the case be closed at the permanency hearing on December 4, 2013.

12. After hearing evidence from CASA and FCM, the Court denied DCS's Request to Terminate Wardship.

13. FCM Fikes testified that a few weeks after this hearing he received a call from Child's mother who reported that Father had left Child with her, and she was afraid she'd get in trouble as she was only to have supervised visits. In dealing with this matter, Mr. Fikes found out that the following had occurred since the December hearing; Father had withdrawn Child from school,

---

[2] Father does not challenge the veracity of the testimony cited by the trial court in its findings. We remind the court, however, that a court "does not find something to be a fact by merely reciting that a witness testified to X, Y, or Z." *In re Adoption of T.J.F.*, 798 N.E.2d 867, 874 (Ind. Ct. App. 2003). "Rather, the trier of fact must find that what the witness testified to is the fact. Additionally, the trier of fact must adopt the testimony of the witness before the 'finding' may be considered a finding of fact." *Id.*

stating he was going to home-school him, and had moved from his residence without telling DCS where he was living.

14. After DCS filed a Motion to Produce the Child, Father made contact with FCM Fikes, and a hearing was held on December 31, 2013. The Court ordered that Father was to continue in therapy, see that the child continued in therapy, show proof that Child was enrolled in an on-line school program, and allow the CASA to enter the home and see the child on January 2, 2014. Father had been refusing any kind of entry into his home, and this remained a frequent problem during the case.

15. In February, the child was finally enrolled by Father into the online school program, but therapy had not yet begun. On March 9, 2014, the DCS hotline received a new report concerning the conditions in the home. Father was refusing entry into the home.

16. The Court ordered that DCS be allowed into the home and ordered that law enforcement assist if necessary.

17. FCM Fikes testified that in April, Child was placed in Michiana Behavioral Health Center as an acute placement for violent behavior, after striking his grandmother during a therapy session, and threatening to kill her in her sleep. On April 23, 2014, the Court ordered that Child be detained from his Father's care and placed in Therapeutic Foster Care. Child began to attend regular school, but was far behind his age-mates, and repeated the first grade. He had difficulty controlling his behaviors at school.

18. From the time of this second detention, FCM Fikes and CASA Thomas Brown testified that Father became more non-compliant, refused to take medication as recommended by a psychiatrist, after dragging his feet for nearly a year after he was ordered to get this medication evaluation. Father adamantly refused to take medication of any kind, and his whereabouts and

income were often unclear. He continued to visit Child on a fairly regular schedule, but was not participating in any other court ordered services.

19. At the Permanency hearing, which was held in January of 2015, FCM Fikes recommended that Child's case plan goal change from reunification to Adoption, based on Father's noncompliance, and the length of the case. The Court agreed and approved the case plan of adoption. [DCS filed a petition for the involuntary termination of the parent-child relationship in June 2015.]

20. Father was allowed to have some intermittently supervised time with Child beginning in April of 2015, and chose his own therapist, but could not continue with him due to an inability to pay. Father had initiated family therapy with his therapist, but had not consulted with Child's therapist. On August 19, 2015, the Court suspended family therapy, until it was clear Child was ready. DCS arranged for a new therapist for Father, but his attendance was sporadic.

21. Toward the end of 2015, FCM Fikes and CASA Thomas Brown testified that Child's behavior began to deteriorate in the foster home, and often after visits with his Father there was a noticeable change in Child's conduct and affect.

22. Sometime in early 2016, Child's paternal grandmother passed away, and a significant increase in odd behaviors of Father was noted. Father became essentially homeless, and had no income that DCS was aware of. While he had finally completed all his evaluations, he still refused to take medication of any kind. During a visit with Child, it was reported that Father placed a lot of food in his bag while at a restaurant.

23. At times when he got agitated, Father would slap himself forcefully. He did this at his therapist's office for a meeting.

24.  FCM Fikes testified that he observed Father slap himself hard on the morning of trial.

25.  Father's mental health problems very negatively affected Child, and in May of 2016, DCS petitioned the Court to suspend Father's visits.  The Court granted that petition on June 15, 2016, and those visits have not been reinstated.

26.  Child became increasingly aggressive at this time, and attacked and cursed at his foster mother, where he had been placed since April of 2014.  This had not happened before.  Child was moved to a new foster home, one into which his half-sister had been adopted a few years before.

27.  Foster mother testified at trial that Child's behavior had calmed down since he came to the foster home in June, and that he became more outgoing and relaxed with the consistent routine in the foster home and over the summer months became more like a "kid" instead of the anxious, defiant child he'd been when they came to him.

28.  Father came to trial on October 27, 2016, and came into the Courtroom, but reported via his counsel that he was unable to stay at trial because he had an abscessed tooth and could not talk, but that he'd be there on October 28, 2016.  He did not want to stay and listen to testimony and stated "I don't even want to be here."  Mr. Fikes and Thomas Brown testified that prior to trial beginning Father had not made mention, or gave any indication he was in pain, or could not stay for any reason.

29.  Father did not provide any documentation indicating that he had any medical problems and did say thank you when the Court told him he was free to leave.

30.  FCM Eric Fikes and CASA Thomas Brown both testified that the reasons for removal had not been remedied, and that continuing the parent-child relationship was a threat to Child's

well-being. They testified as well that terminating parental rights was in Child's best interest.

31. FCM Fikes testified that DCS's plan for Child was adoption by his current foster parents.

32. CASA Thomas Brown agreed this plan was in Child's best interest.

….

34. In this case, Child has been out of the care of his parents […] since December of 2012, and although home for a trial home visit for approximately ten months, that failed, and since April of 2014, he has been continuously out of his parents' homes.

The Court now finds that the Department of Child Services has proven by clear and convincing evidence that Child has been removed for fifteen (15) of the most recent twenty-two (22) months.

The Department of Child Services St. Joseph Count[y] Office has demonstrated a reasonable probability that BOTH the conditions that led to the removal of the child from the home and placement outside of the home; will not be remedied; and

That there is a reasonable probability that the continuation of the parent child relationship poses a threat to the well-being of the child.

The Department of Child Services St. Joseph County office has proven by clear and convincing evidence that termination of the parental rights between Father and Child is the best interest of the child.

The Department of Child Services has demonstrated that there is a satisfactory plan for the child, namely adoption.

Appealed Order at 1-5. The trial court granted DCS's petition and terminated the parent-child relationship. Father now appeals.

## Discussion and Decision

[3] "[A]lthough parental rights are of a constitutional dimension, the law provides for the termination of these rights when the parents are unable or unwilling to meet their parental responsibilities." *In re A.P.*, 882 N.E.2d 799, 805 (Ind. Ct. App. 2008). The purpose of terminating parental rights is not to punish parents, but to protect their children. *Id.* "[T]ermination is intended as a last resort, available only when all other reasonable efforts have failed." *Id.* The trial court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.* at 807.

[4] A petition for the involuntary termination of parental rights must allege in pertinent part:

> (A) that one (1) of the following is true:
>
> > ….
> >
> > (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
>
> (B) that *one* (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.[3]

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

---

[3] In his original brief, Father did not challenge the trial court's conclusion that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to Child's well-being; he argued only that DCS had failed to prove that there is a reasonable probability that the conditions that resulted in Child's removal or the reasons for placement outside the home will not be remedied. In its appellee's brief, DCS noted that subparagraph (B) of Indiana Code Section 31-35-2-4(b)(2) is written in the disjunctive and argued that therefore Father had "waive[d] his argument that DCS did not prove the elements under Indiana Code § 31-35-2-4(b)(2)(B)." Appellee's Br. at 17. After the appeal was fully briefed, we struck Father's original brief because its statement of facts did not comply with Indiana Appellate Rule 46(A)(6). Father filed an amended brief with a statement of facts that concludes as follows: "[Father] initiated this appeal because he does not believe DCS met its burden of proving the conditions which caused the removal of [Child] from his home will not be corrected; he does not believe continuing the parent-child relationship is a threat to [Child]." Appellant's Amended Br. at 8. This is Father's first and only mention of the "threat" component of Indiana Code Section 31-35-2-4(b)(2)(B), and because he did not raise and develop an argument about it in his original brief, we deem the issue waived. And because subparagraph (B) is written in the disjunctive, we need not address Father's argument regarding whether the conditions that led to Child's removal will be remedied.

Ind. Code § 31-35-2-4(b)(2) (emphasis added). DCS must prove "each and every element" by clear and convincing evidence. *In re G.Y.*, 904 N.E.2d 1257, 1261 (Ind. 2009); Ind. Code § 31-37-14-2.

> Clear and convincing evidence as a standard of proof requires the existence of a fact to be highly probable. It need not reveal that the continued custody of the parent is wholly inadequate for the children's very survival. Rather, it is sufficient to show that the children's emotional and physical development are threatened by the parent's custody.

*In re D.W.*, 969 N.E.2d 89, 94 (Ind. Ct. App. 2012) (alteration, citations, and quotation marks omitted). If the trial court finds that the allegations in the petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[5] "Our standard of review is highly deferential in cases concerning the termination of parental rights." *In re D.P.*, 27 N.E.3d 1162, 1165 (Ind. Ct. App. 2015).

> We neither reweigh evidence nor assess witness credibility. We consider only the evidence and reasonable inferences favorable to the trial court's judgment. Where the trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous.

*C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92-93 (Ind. Ct. App. 2014) (citations omitted). "A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *In re R.J.*, 829 N.E.2d 1032, 1035 (Ind. Ct. App. 2005).

[6]     Father contends that the trial court erred in concluding that termination of his parental rights is in Child's best interests. In determining a child's best interests, the trial court must look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). The trial court must subordinate the parent's interests to the child's interests. *Id.* A parent's historical inability to provide a suitable environment along with his current inability to do the same supports a finding that termination of parental rights is in the child's best interests. *Id.*

[7]     Father claims that "[t]he evidence demonstrated that [he] always had a home that had utilities in working order, a bedroom for [Child], food and clothing for [Child], and [Child] always had good hygiene." Appellant's Amended Br. at 12-13.[4] In fact, when DCS became involved with the family in December 2012, Father and Child were living in deplorable conditions, as detailed in finding 3 above. Child had what appeared to be ringworm, stated that Father had not taken him to the doctor, and reported that he was often verbally berated.

---

[4] Father also claims that "[m]ental illness of a parent, standing alone, is not a proper ground for terminating parental rights." Appellant's Amended Br. at 13. The trial court did not terminate Father's parental rights based solely on his mental health issues.

Father initially complied with the trial court's dispositional order, but after a December 2013 hearing he withdrew Child from school, changed residences without informing DCS, and then refused to allow DCS to enter the home. Child began acting out, threatened to kill his grandmother, and had academic and behavioral issues when he returned to school. Father became noncompliant with his medication and court-ordered services, and Child began acting out after his visits with Father. After Child's grandmother died in early 2016, Father's mental health deteriorated, and he became homeless, jobless, and physically self-abusive. Child's behavior improved markedly after he was transferred to a new foster home and the court suspended Father's visitations in June 2016. At the termination hearing, which Father declined to attend because of an alleged abscessed tooth, both the FCM and the CASA opined that termination of Father's parental rights was in Child's best interests. The trial court reached the same conclusion, which is supported by the foregoing findings, and Father has failed to establish that the conclusion is clearly erroneous. Therefore, we affirm.

[8] Affirmed.

Vaidik, C.J., and Mathias, J., concur.