## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Oct 05 2020, 8:18 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Dorothy Ferguson
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Abigail Recker
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

K. L.,

*Appellant-Respondent,*

v.

Madison County Department of Child Services,

*Appellee-Petitioner.*

October 5, 2020

Court of Appeals Case No.
20A-JT-828

Appeal from the Madison Circuit Court

The Honorable G. George Pancol, Judge

Trial Court Cause No.
48C02-1910-JT-264

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Respondent, K.L. (Mother), appeals the trial court's Order terminating her parental rights to her minor child, R.R. (Child).

We affirm.

## ISSUE

Mother presents the court with one issue, which we restate as: Whether the trial court's Order terminating her parental rights to Child is clearly erroneous.

## FACTS AND PROCEDURAL HISTORY

On June 25, 2013, Child was born to Mother and biological father, T.R. (Father).[1] Mother and Father have a history of substance abuse. On January 6, 2017, Mother and Father possessed syringes and admitted to methamphetamine use. Due to Parents' arrest, on January 12, 2017, the Department of Child Services (DCS) removed Child from their care, and Child was placed in a relative's care.

On January 17, 2017, DCS filed a petition alleging that Child was a child in need of services (CHINS) because of Mother's substance abuse issues. On January 25, 2017, Mother admitted that Child was a CHINS. On February 22, 2017, the trial court ordered Mother to complete a substance abuse assessment

---

[1] On July 25, 2019, Father's parental rights to R.R. were terminated in a prior proceeding. T.R. does not participate in this appeal.

and treatment, random drug screens, a parenting assessment and any recommended classes, individual counseling, and supervised parenting time. Mother was also ordered to refrain from consuming illegal substances. On March 17, 2017, DCS filed a motion to remove Child from his placement with relatives because Child had been left unsupervised in Mother's care. Child was placed in foster care, where he has resided ever since.

[6] Mother's January 6, 2017, arrest led to the State filing charges against her of Level 6 felony unlawful possession of a syringe, Level 6 felony maintaining a common nuisance, Class C misdemeanor possession of paraphernalia, and Class C misdemeanor operating a motor vehicle without ever receiving a license under Cause Number 48C05-1703-F6-602 (Cause -602). While Cause -602 was pending, on April 25, 2017, Mother was charged in Cause Number 48C05-1704-F4-1043 (Cause -1043) with Level 6 felony assisting a criminal when she refused to answer her door when police arrived to serve a warrant on Father. On February 26, 2018, Mother pleaded guilty to the maintaining a common nuisance and operating a vehicle while never being licensed charges in Cause -604 and to the assisting a criminal charge in Cause -1043. The trial court sentenced Mother to two years and 182 days in Cause -602 and to 363 days in Cause -1043, all suspended to probation.

[7] As Mother's criminal cases were unfolding, DCS referred Mother for substance abuse assessments and treatment. At the beginning of the CHINS case, Mother completed a substance abuse assessment and did not test positive for illegal substances for approximately eight months while she was being treated with

suboxone. Thereafter, Mother did not comply consistently with random drug screening. Mother was drug screened by DCS throughout the instant case and the underlying CHINS proceedings. From November 16, 2017, to November 7, 2019, Mother tested positive for illegal substances, mostly methamphetamine and amphetamine, on twenty occasions. In 2018, Mother checked herself out of in-patient substance abuse treatment at Transitions in Fort Wayne after one week. After Mother voluntarily left in-patient treatment, she requested that random drug screening be reinstated but then never participated. Mother completed a second substance abuse assessment but did not follow up on the resulting treatment recommendations. During the CHINS proceedings Mother was closed out of individual therapy for noncompliance.

[8] DCS also referred Mother for home-based case management to address her housing instability and unemployment issues. After a permanency hearing on December 27, 2017, the trial court found that Mother had not yet begun her home-based services, despite referrals being in place. Once beginning her home-based services, Mother did not participate consistently. As of January 14, 2019, Mother had been closed out of her home-based services for non-compliance. Mother did not gain consistent employment. Mother had at least three residences during the CHINS proceedings, one of which was with her boyfriend, who she admitted to FCM Andrea Dickerson (FCM Dickerson) on several occasions had inflicted domestic violence upon her. As of January 14, 2019, Mother had been evicted from her HUD housing for a rule violation.

[9]     Mother did not complete a parenting assessment even though DCS entered a referral for one. After an initial period of non-attendance, Mother exercised regular parenting time with Child and completed a "1, 2, 3 Magic" training. (Transcript p. 49). DCS increased the frequency of Mother's parenting time, and Mother was allowed to exercise her parenting time in her home. However, parenting time was decreased and eventually moved back to a facility due to Mother's continued positive drug screens and Mother becoming overwhelmed and emotional during sessions. The move back to a facility occurred after an episode where Mother had an emotional outburst and told Child that his behavior was the reason that he could not come home. In March 2019, Mother's supervised parenting time was closed out for non-attendance, although it was later reinstated.

[10]    Mother was arrested on several occasions during the CHINS proceedings for violating her probation by abusing illegal substances. On December 27, 2017, a concurrent plan of adoption was added to Child's permanency plan. On October 25, 2019, DCS filed a petition seeking to terminate Mother's parental rights to Child. In November 2019, Mother was re-incarcerated for violating her probation. Just prior to becoming re-incarcerated, Mother reported participating in services again and completing an extended-outpatient, group-therapy program (EOP), despite her spotty attendance. Mother did not complete the individual therapy portion of her treatment before becoming re-incarcerated.

[11]    January 7, 2020, and February 25, 2020, the trial court held evidentiary hearings on DCS's termination petition. FCM Robert Barnes (FCM Barnes) testified that Mother had admitted to him after her last positive drug screen on November 7, 2019, that she continued to use methamphetamine. FCM Dickerson related that Mother had abducted Child from a prior placement and had threatened to do so again. It was FCM Dickerson's opinion that it was in Child's best interests that Mother's parental rights be terminated.

[12]    By the time of the second termination hearing, Mother had recently been released from having spent three months in jail. Mother was initially released to serve six months on house arrest but had been noncompliant with the house arrest rules and was placed on work release. Mother had completed the "No More Excuses" substance abuse program while in jail and was attending twelve-step and Celebrate Recovery groups. (Tr. p. 78). Mother acknowledged that her recent three-month period of abstinence from substance abuse had occurred while she had been incarcerated. Mother requested more time to engage in services before her parental rights were terminated.

[13]    Child had been placed with the same foster family since February 20, 2018. By the time of the termination hearings, Child no longer required any services through DCS and had discontinued therapy in fall 2019. Child's foster father related that he and Child's foster mother were able to provide for Child's needs. Child has two foster sisters in his home. Child's foster family sought to adopt Child and had already filed a petition to do so.

[14] Child's CASA, Stephanie Hamilton (CASA Hamilton), served during the CHINS and termination proceedings. CASA Hamilton recognized that Mother loved Child but that Mother had been unable to address her substance abuse issues and provide Child with a stable environment. After interacting with Mother throughout the proceedings, CASA Hamilton had concluded that Mother's intentions were good but that she could not follow through with treatment or services for extended periods of time. Mother had not exercised parenting time with Child in the months prior to the termination hearing. CASA Hamilton noted that after this period of Mother's absence, "there is a light in [Child's] eyes that I haven't seen previously." (Tr. p. 64). CASA Hamilton had inspected Child's foster home and found it suitable and appropriate for Child. CASA Hamilton believed that it was in Child's best interests that Mother's parental rights be terminated.

[15] On February 25, 2020, in a separate proceeding, Mother admitted that she had violated her probation in Cause -1043, and the trial court revoked her probation to 231 days in the Continuum of Sanctions program.

[16] On March 11, 2020, the trial court issued its Order terminating Mother's rights to Child. In its eleven-page Order, the trial court entered findings consistent with the facts recited herein. The trial court concluded that there was no reasonable probability that the conditions that resulted in Child's removal from Mother would be remedied and that it was in Child's best interests that Mother's parental rights be terminated.

Mother now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

Mother challenges the evidence supporting the trial court's Order terminating her rights to Child. It is well-settled that when reviewing the evidence supporting the termination of parental rights, we neither reweigh the evidence nor determine the credibility of witnesses. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). In addition, we consider only the evidence that supports the judgment and the reasonable inferences to be drawn from that evidence. *Id.* "We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment." *Id.* We must give due regard to the trial court's opportunity to judge the credibility of witnesses firsthand, and we do not set aside the trial court's findings or judgment unless it is clearly erroneous. *Id.* Mother does not challenge any of the trial court's specific findings of fact, so we will accept those findings as correct. *S.S.*, 120 N.E.3d 605, 610 (Ind. Ct. App. 2019).

## II. *Termination of Mother's Rights*

"[O]ne of the most valued relationships in our culture" is that between a parent and his or her child. *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009), *reh'g denied.* Indeed, "[a] parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.*

(quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). Accordingly, the Fourteenth Amendment to the United States Constitution safeguards "the traditional right of parents to establish a home and raise their children." *Id.* Nevertheless, parental interests are not absolute; rather, termination of parental rights is appropriate when parents are unable or unwilling to meet their parental responsibilities. *In re A.B.*, 887 N.E.2d 158, 164 (Ind. Ct. App. 2008).

[20] Termination of parental rights is an extreme sanction that is intended as a "last resort" and is available only when all other reasonable efforts have failed. *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 91 (Ind. Ct. App. 2014). As such, before a termination of parental rights is merited, the State is required to prove a host of facts by clear and convincing evidence, the most relevant for our purposes being that there is a reasonable probability that the conditions which resulted in the child's removal and continued placement outside the home will not be remedied by the parents, Mother's continued relationship with Child poses a threat to Child's well-being, and that termination is in the best interests of the child. Ind. Code §§ 31-35-2-4(b)(2)(B)(i-ii), (C); I.C. § 31-37-14-2. We address those factors in turn.

A. *Reasonable Probability Conditions Will Not Be Remedied*

[21] When reviewing a trial court's determination that the conditions that resulted in the child's removal will not be remedied, we engage in a two-step analysis. *E.M.*, 4 N.E.3d at 642-43. First, we must identify the conditions that led to removal; second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id*. at 643. When engaging in the

second step of this analysis, a trial court must judge a parent's fitness as of the time of the TPR proceeding, taking into account evidence of changed conditions, balancing any recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* This delicate balance is entrusted to the trial court, and a trial court acts within its discretion when it weighs a parent's prior history more heavily than efforts made only shortly before termination. *Id.* "Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior." *Id.*

[22] Here, Child was removed from Mother's care because of her substance abuse issues which affected other areas of her life, such as her ability to maintain stable housing and employment. The trial court ordered Mother to participate in a number of services to address her substance abuse, housing instability, and unemployment, but she did not consistently engage in those services or benefit from them when she did engage. Mother completed substance abuse assessments and participated in some services but was closed out of random drug screening, home-based services, and individual counseling. When Mother submitted to drug screens through DCS, she tested positive for methamphetamine and amphetamine on twenty occasions throughout the underlying CHINS and after the termination proceedings were initiated. Mother checked herself out of in-patient substance abuse treatment after one week in 2018 and continued to use drugs after she completed EOP in 2019 until

she was reincarcerated. Mother did not find employment or establish a stable residence for Child, and her reincarceration in 2019 further prevented her from reaching those goals. Accordingly, we find that the trial court's findings supported its conclusion that there was a reasonable likelihood that the conditions that merited Child's removal would not be remedied. *See In re D.W.*, 969 N.E.2d 89, 96-97 (Ind. Ct. App. 2012) (finding sufficient evidence that conditions of removal would not be remedied where Father "consistently failed to take advantage of services provided and ordered by the trial court and consistently failed to stay clean of drugs.").

[23] In her argument to the contrary, Mother directs our attention to evidence in the record of her recent efforts at sobriety, employment, and housing. Mother was sober for the three months she was incarcerated and found employment when she was placed on work release after violating the terms of her home detention. Mother also testified at the second termination hearing that her father was keeping an apartment for her until she was able to take it over. (Tr. p. 76). We commend Mother's efforts toward sobriety, finding employment, and possibly procuring an apartment. However, it was within the trial court's discretion to weigh Mother's two-year, documented history of repeated substance abuse relapses, failure to engage in services, and housing and employment instability more heavily than her short-term sobriety while in jail, her employment required as part of her conditional release on work release, and nebulous testimony about an apartment. *E.M.*, 4 N.E.3d at 643; *see also In re L.R.*, 79 N.E.3d 985, 992 (Ind. Ct. App. 2017) (upholding the trial court's order despite

Mother's engagement in services and clean drug screens because, by her own admissions, her recent stability had lasted only a few months), *trans. denied*. In addition, although Mother expressed the hope that her probation officer would approve her being switched from work release to home detention, the record shows that on the same day as the second termination hearing, Mother was ordered to serve 231 days with the Continuum of Sanctions program. Because the evidence and the trial court's findings clearly and convincingly supported its determination, we find no clear error on its part. *See E.M.*, 4 N.E.3d at 642.

[24] Mother contends that the trial court "terminated mother's rights because she was incarcerated at the time of the termination proceeding." (Appellant's Br. p. 10). Mother likens her case to *Rowlett v. Vanderburgh Cty. OFC*, 841 N.E.2d 615, 622 (Ind. Ct. App. 2006), *trans. denied*, wherein another panel of the Court reversed the termination of Rowlett's parental rights based partially on its conclusion that DCS had failed to show that there was a reasonable likelihood that the conditions that merited removal would not be remedied. Rowlett had been incarcerated for all but two months of the CHINS proceedings and for all of the termination proceedings. *Id*. DCS did not communicate with Rowlett while he was incarcerated. *Id*. Nevertheless, during his incarceration, Rowlett had participated in over 1,000 hours of individual and group services directed at improving his parenting, anger management, and sobriety; he took college courses and was working toward a degree; and he had remained sober during his lengthy incarceration. *Id*. Observing that conditions must be assessed as of the time of the termination hearing, the Court held that DCS's evidence of

Rowlett's long pre-incarceration history of substance abuse, criminal activity, transient lifestyle, unemployment, and lack of parenting skills did not accurately reflect his current ability to parent. *Id*. at 621-22.

[25] We find that Mother's case is factually distinguishable from *Rowlett*. Here, Mother was not incarcerated for the majority of the CHINS and for all of the termination proceedings, and, thus, she had an opportunity to engage in DCS services that was absent in *Rowlett*. DCS referred her to a host of services in which she either participated inconsistently or not at all. Mother did not put in the quality and quantity of effort displayed by Rowlett, either when she was free in society or when she was incarcerated. Rowlett had also maintained his sobriety for a much longer period of time than Mother. As such, we do not find Mother's reliance on *Rowlett* to be persuasive.

[26] Mother also argues that there was insufficient evidence to support the trial court's conclusion that her continued relationship with Child constituted a threat to Child's well-being. However, the trial court did not enumerate that legal conclusion in its Order as a basis for terminating Mother's parental rights. Even if it had, the termination statute is written in the disjunctive, such that the State was required to make either the 'conditions' or 'threat' showing, not both. *Bester v. Lake Cty. OFC*, 839 N.E.2d 143, 148 n.5 (Ind. 2005). Therefore, because we have found that the evidence supported the trial court's conclusion on the 'conditions' factor, we do not address the second portion of Mother's argument.

## B. *Child's Best Interests*

Mother also contends that the evidence did not support the trial court's conclusion that termination was in Child's best interests. Our supreme court has recognized that one of the most difficult aspects of a termination of parental rights determination is the issue of whether the termination is in the child's best interest. *E.M.*, 4 N.E.3d at 647 (noting that the question "necessarily places the children's interest in preserving the family into conflict with their need for permanency"). The trial court's determination that termination was in a child's best interests requires it to look at the totality of the evidence of a particular case. *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*. "In doing so, the trial court must subordinate the interests of the parents to those of the children involved." *Id.*

Here, the trial court found that there was a reasonable likelihood that the conditions meriting Child's removal from Mother's care would not be remedied; FCM Dickerson opined that termination was in Child's best interests; and CASA Hamilton had concluded that termination was in Child's best interests. These findings alone supported the trial court's determination that termination of Mother's parental rights was in Child's best interests. *See A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158-59 (Ind. Ct. App. 2013) (finding the evidence supported the trial court's 'best interests' determination where the family case manager and CASA supported termination and the conditions resulting in removal would not be remedied), *trans. denied*.

[29] Other evidence and findings buttressed the trial court's determination. At times during supervised parenting time during the CHINS proceedings, Mother displayed a lack of patience with Child and spoke inappropriately to him, such as when she essentially blamed the fact that they no longer lived together on his behavior instead of her own drug use. Mother had abducted Child from a previous placement and expressed a willingness to do so again, which is not an act consistent with good parenting and which indicates that Mother continued to place her own needs above Child's. In the months leading up to the termination hearings when Mother was not exercising parenting time, Child's CASA noted that he seemed happier and "his emotions became more regulated[.]" (Tr. p. 65). Child had been in a secure, stable, pre-adoptive home for two years where he no longer required services and was thriving with his two foster sisters. In short, we conclude that the totality of the evidence and findings supported the trial court's determination that termination was in Child's best interests and, therefore, was not clearly erroneous. *See E.M.*, 4 N.E.3d at 642.

## CONCLUSION

[30] Based on the foregoing, we conclude that the trial court's Order terminating Mother's parental rights to Child was supported by the evidence and was not clearly erroneous.

[31] Affirmed.

[32] May, J. and Altice, J. concur